**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA TALLAHASSEE DIVISION**

**MITCHELL JACKSON,**

**Plaintiff,**

**vs.** **Case No. 4:13cv398-WS/CAS**

**TREVOR MELIA, and CHARLES RICHTER,**

**Defendants.**

**_____________________________/**

# REPORT AND RECOMMENDATION

On May 27, 2014, Defendants filed a motion for summary judgment, doc. 36, supported by numerous exhibits. Plaintiff, an inmate proceeding pro se, was advised of his obligation to respond to the motion for summary judgment, doc. 40, and he timely filed his response. Doc. 42.

Thereafter, Defendants filed a motion to strike Plaintiff's response. Doc. 43. That motion was denied, but Defendants were permitted to file a reply to Plaintiff's response. Doc. 44. After Defendants filed their reply, doc. 47, Plaintiff requested leave to file a sur-reply. Doc. 48. Plaintiff's motion was granted, doc. 49, and Plaintiff timely filed the sur-reply. The motion for summary judgment is ready for a ruling.

**Allegations of the complaint, doc. 1**

Plaintiff contends that after he notified Defendant Melia, a sergeant at Madison Correctional Institution, that the light in his cell had been out for 14 or 15 days, Melia indicated he would move Plaintiff and his call partner to a different location. Doc. 1 at 5. Plaintiff alleged that moving Plaintiff as indicated (to an open bay dormitory) would present "an inner institutional security issue." *Id.* Plaintiff spoke to Captain Surles, Melia's supervisor, about the security issue who made a telephone call to Melia. *Id.* at 5-6. Plaintiff stood nearby as Surles and Melia discussed the issue on the telephone, along with the fact that "many grievances had been filed on the maintenance department." *Id.* Surles then sent Plaintiff to see Melia. *Id.* at 6.

Plaintiff went to the L-dorm foyer and waited for Melia. Doc. 1 at 6. When Melia arrived, he was accompanied by Defendant Richter, a correctional officer at Madison C.I. at the time of the events in question. *Id.* at 6, 12. Plaintiff alleges that Richter is the son of the maintenance director, Mr. Richter. *Id.* at 6. Plaintiff said that Melia began a tirade, complaining about grievances written about him and going over his head to his supervisor. *Id.* When Plaintiff tried to tell Melia he had not written any grievances against Melia or Richter's father, Melia told Plaintiff he would fix his light and then show him who ran the dorm. *Id.*

About half an hour later, maintenance came and replaced the light bulb in his cell. *Id.* at 7. Ten minutes later, Richter came to Plaintiff's cell and told him to "cuff-up," that he was taking Plaintiff to confinement. *Id.* When Plaintiff asked why, Richter said it was because Plaintiff went over Melia's head when he complained to Captain Surles

about the light. *Id.* Richter said that he had to do what Melia told him to do or h would get written him, and said he had to take Plaintiff to confinement unless Plaintiff could talk to Melia. *Id.* Plaintiff went to speak with Melia, but was told to wait. A few minutes later, Melia told Plaintiff to "come on" and they returned to Plaintiff's cell. *Id.* Melia went to Plaintiff's cell door ahead of Plaintiff and asked Richter: "what'cha got?" *Id.* Plaintiff said he could not see what Richter showed Melia, but Richter said: "I found it in his mattress." *Id.* Melia placed Plaintiff in handcuffs and asked him why he needed a knife. *Id.* Plaintiff then turned to Richter and protested that he did not have knife, has never had one, and asked Richter not to do this. *Id.*

Plaintiff was written a disciplinary report for possession/manufacture of weapons. Doc. 1 at 8. Plaintiff was found guilty based on the statements of Defendant Richter. *Id.* Plaintiff's appeal of the disciplinary report "was favorably decided" in his favor on September 17, 2009, but he was not released from disciplinary confinement for another week. *Id.*

Melia then told Plaintiff that as his "last official act" while he was still working at Madison Correctional Institution, he was going to write Plaintiff two more disciplinary reports. *Id.* at 8. Plaintiff does not indicate whether Melia followed through with that threat, or what transpired with the disciplinary reports, if written.

Plaintiff claimed that Defendants conspired to violate his First Amendment rights and retaliated against him because Plaintiff verbally complained about his cell light. Doc. 1 at 9-10. Plaintiff contends Defendants fabricated a weapon and wrote Plaintiff a false disciplinary report as retaliation. Plaintiff also asserts that Defendants violated his

right to be free from cruel and unusual punishment. *Id.* As relief, Plaintiff seeks monetary damages, costs of litigation, and a jury trial. *Id.* 13.

**Legal standards governing a motion for summary judgment**

On a motion for summary judgment Defendants initially have the burden to demonstrate an absence of evidence to support the nonmoving party's case. Celotex Corporation v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2553-54, 91 L. Ed. 2d 265 (1986). If they do so, the burden shifts to Plaintiff to come forward with evidentiary material demonstrating a genuine issue of material fact for trial. *Id*. An issue of fact is "material" if it could affect the outcome of the case. Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259 (11th Cir. 2004) (citations omitted). Plaintiff must show more than the existence of a "metaphysical doubt" regarding the material facts, Matsushita Electric Indus. Co., LTD. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986), and a "scintilla" of evidence is insufficient. The court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Hickson Corp., 357 F.3d at 1260 (quoting Anderson v. Liberty Lobby, 477 U.S. 242, 252, 106 S. Ct. 2505, 2505, 91 L. Ed. 2d 202 (1986)). All reasonable inferences must be resolved in the light most favorable to the nonmoving party, Watkins v. Ford Motor Co., 190 F.3d 1213, 1216 (11th Cir. 1999), if there is a genuine dispute as to those facts. Scott v. Harris, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (cited in Ricci v. DeStefano, 129 S.Ct. 2658, 2677 (2009)). "Where the record taken as a whole could not lead a rational trier of fact to find for the

nonmoving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co., 475 U.S. at 587 (internal quotation marks omitted) (quoted in Ricci, 129 S.Ct. at 2677).

"Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997), *cert. denied* 522 U.S. 1126 (1998) (quoting Celotex, 477 U.S. at 324, 106 S. Ct. at 2553 (quoting Fed. R. Civ. P. 56(c), (e))). The nonmoving party need not produce evidence in a form that would be admissible as Rule 56(e) permits opposition to a summary judgment motion by any of the kinds of evidentiary materials listed in Rule 56(c). Owen, 117 F.3d at 1236; Celotex, 477 U.S. at 324, 106 S. Ct. at 2553.

**Relevant Rule 56 Evidence**

**A. Defendants' evidence**

At the time of the events in question, Defendant Trevor Melia was the housing sergeant and Defendant Charles Richter was a housing officer in the L-dormitory of Madison Correctional Institution. Doc. 36, Exhibits B-C. Thus, Melia was Richter's supervisor. *Id.*

On August 10, 2009, Richter "came across an anonymous inmate request addressed to 'Sgt. Amelia,' which indicated that [Plaintiff] had a shank in his cell." Doc. 3, Ex. C, ¶ 5; *see* Doc. 36, Ex. C, Ex. 1 at 5. Richter went to conduct a search of Plaintiff's cell and "found a metal rod about 8" long with a shoelace handle stuck in" Plaintiff's mattress. Doc. 3, Ex. C. Richter wrote Plaintiff a disciplinary report for

possession or manufacture of a weapon on August 10th at approximately 3 p.m. *Id.*; *see also* Doc. 36, Ex. C, Ex. 1 at 1, 3. The disciplinary report was approved by Capt. R. Surles, but the form indicates it was not delivered to Plaintiff until August 17, 2009. *Id.*[1]

The disciplinary report stated, in relevant part:

> On August 10, 2009, I was assigned as L-dormitory housing officer. At approximately 1440 hours, I discovered an inmate request in the foyer area outside of Wing #1 (original attached) stating that inmate Jackson, Mitchell #900880 in cell L-3219L was in possession of a weapon. I conducted a complete and thorough search of his cell and bunk, cell L-3219 on Wing #3 and discovered a metal rod approximately 8 inches in length with a shoelace handle stuck in his mattress (photos attached). Inmate Jackson stated when questioned, “that ain’t mine I’m being set up, you people put that there, I got people in Tallahassee that work for central office, you don’t know who you’re messing with. I’m gonna get your job for this.” . . . It should be noted that inmate Voorhess [sic], Donald #284611 is also housed in cell L-3219, but was not present at the time of this incident. . . . The metal rod was confiscated and placed in the evidence locker for further disposition. The shift supervisor was notified and authorized this report.

Doc. 36, Ex. C at 3;[2] doc. 36, Ex. E at 32. The investigation report indicates Plaintiff declined staff assistance, but listed one inmate witness, Donald Voorheese. Doc. 36, Ex. C, Ex. 1 at 4, 7. That report form states the investigation was completed on August 17, 2009, by investigating Officer P. Hall. *Id.*

The documents provided in the "DR packet" (Ex. 1) reveal that several inmates provided witness statements (more than the one inmate witness listed by Plaintiff), and

[1] Notwithstanding that date, it appears that Plaintiff was aware of the disciplinary charge earlier as Plaintiff wrote his own witness statement on August 12, 2009. Doc. 36, Ex. C, Ex. 1 at 10.

[2] Attached to Exhibit C (Richter's affidavit) is "exhibit 1," consisting of 38 pages, including the disciplinary charge, investigation documents, a photograph of the shank, and the result of disciplinary report.

statements were provided by two staff members, Surles and Melia. Doc. 36, Ex. C, Ex. 1 at 4, 7.

Plaintiff's witness statement provided, in relevant part:

> I at no time have had possession of a weapon. Not constructively or otherwise. I never told Mr. Richter that I had family in the central office. However, when Mr. Richter entered my cell to shake it down he stated that he hated being a genni [sic] pig but had to do this to me or he'd be written up. He state that I was going to confinement because that's how it works. He then sent me to see Sgt. Melia while he (Richter) shook my house down. He was there by himself and planted that weapon at Sgt. Melia's earlier direction. I have written the warden and inspector and respectfully request polygraph examinations of all parties involved prior to any disciplinary proceedings. I know for a fact that Sgt. Melia and Mr. Richter put that weapon in my cell.

Doc. 36, Ex. C, Ex. 1 at 10-11. Plaintiff's statement went on to reference the altercation earlier that day over the light in his cell and Melia's anger at him. Doc. 36, Ex. C, Ex. 1 at 11. Melia provided a statement in which he said Plaintiff's "assertions are ridiculus [sic], and false." *Id.* at 12. Melia wrote:

> The evidence speaks for itself. Inmate Jackson did claim "that he was connected to important people at Central Office, and would make any statement neccessary [sic] to get my job." At no time, or any time, was c/o Richter given instruction by me or anyone else to plant a weapon in Inmate Jacksons cell.

*Id.* Another witness statement was provided by Captain Surles:

> On 8/10/09 at approx. 12:40 pm, Inmate Jackson approached my outside dining hall and advised me that his assigned cell light was out of order. I contacted Sgt. Melia in L-dorm and advised him to check all lights in dorm and submit work order. Inmate Jackson advised me that staff in L dorm contacted maintenance concerning the maint. issues. Sgt. Melia advised me to have Inmate Jackson report to him in L-dorm. I instructed inmate Jackson to report to L-dorm to Sgt. Melia. Later, Sgt. Melia contacted me and advised that while conducting a cell search, officer Righter discovered a homemade weapon in inmate Jackson's mattress.

Doc. 36, Ex. C, Ex. 1 at 13.

Plaintiff's cellmate also provided a statement which said: "To the best of my knowledge, I never seen Mitchell Jackson with any weapon, at anytime." *Id.* at 14.

The investigation includes a statement from inmate Jason Cox, signed on August 18, 2009, who said:

> I also wrote a grievance to maintenance. Just like Mitchell, I was confronted & threatened. By Sgt. Melia on 7-20-09 told [sic] not to write anymore grievances on maint. and inmate Benny Johnson who at that time resided in 2105-4 was a witness to this threat. This shows the type of actions Sgt. Melia & officer Rickter [sic] take to resolve their problems. It should be noted officer Ricker's kin runs maint. Also I fear retaliation from Sgt. Melia & officer Rickter [sic] for my participation in this process.

Doc. 36, Ex. C, Ex. 1 at 15.

Another statement was provided by inmate Robert LeFlure in August 18, 2009:

> Though I do not live in the wing where inmate Jackson was housed when the knife was found, I do know inmate Jackson and Sgt. Melia (check spelling) have had differences in the past. I also have been conselled [sic] by Sgt. Melia about complaining and writing grievances, so I do know firsthand the tactics Sgt. Melia and officer Richter employ. And by writing this statement I believe I have placed myself in jeopardy as well.

Doc. 36, Ex. C, Ex. 1 at 16. Inmate Daniel Hamm voluntarily refused to provide a written statement. Doc. 36, Ex. C, Ex. 1 at 17.

The evidence indicates the disciplinary hearing took place on August 18, 2009. Doc. 36, Ex. C at 18. Plaintiff was presented, and pled not guilty. Plaintiff was found guilty of the disciplinary report as charged based on the statement of facts submitted by Richter, and sanctioned with 60 days in disciplinary confinement. Doc. 36, Ex. D.

Plaintiff filed an appeal of the disciplinary results, raising four issues. Doc. 36, Ex. F.[3] On September 17, 2009, Plaintiff's appeal was approved and the disciplinary report was overturned because of "procedural errors made by staff in the processing of" the disciplinary report. Doc. 36, Ex. F at 12. The Grievance Approval Action Form indicates that "staff made procedural errors in the processing of this disciplinary report." Doc. 36, Ex. G. The form noted that the "[w]eapon was not found in evidence safe and was unavailable for evidence." *Id.* Defendants state that the Grievance Approval Action Form which overturned the disciplinary report was not received by classification at Madison C.I. until September 23, 2009. *Id.*; *see also* doc. 36 at 6. Plaintiff was released from disciplinary confinement the following day, September 24th. Doc. 36 at 7 (citing Doc. 36, Ex. D).

As a result of the disciplinary report, Plaintiff's visitation privileges were suspended while he was in confinement, but Plaintiff did not lose gain time or incur any other adverse consequence. Doc. 36, Ex. E at 15-25. Plaintiff had not written any grievances about the light in his cell being out. Doc. 36, Ex. E at 5. Plaintiff believes that his verbal complaint about the light was the basis for the retaliation. *Id.* at 27. He also believes that he was subjected to "undue punishment" because of the retaliatory disciplinary report. *Id.*

---

[3] Plaintiff argued no one was present in his cell when Richter searched the cell; that the weapon was not produced at the hearing as he requested and the photograph of the shank was not time or date stamped; the disciplinary team was not impartial because it included the official (Captain Surles) who authorized issuance of the disciplinary report; and Plaintiff argues that his cell was in L-dorm, an open population dormitory where 85 inmates had access to his cell. Doc. 36, Ex. F.

Defendants submitted Melia's affidavit as supporting evidence. Doc. 36, Ex. B. Melia states that he did not "order any staff any weapon" in Plaintiff's cell, or to retaliate or threaten him in any way. Doc. 36, Ex. B. Melia avers that he "played no role" in issuance of the disciplinary report to Plaintiff and has no knowledge of the "anonymous inmate request that resulted in the search of" Plaintiff's cell. *Id.* Melia's only involvement with the disciplinary report "consisted solely of providing a written statement" as part of the investigation. *Id.*

Melia also states he has "no knowledge of how the weapon came into existence or how it found its way into" Plaintiff's possession or cell and "was not involved in any agreement, any understanding, or any order for" a weapon to be "planted" in Plaintiff's cell. *Id.* Melia adds that he "would never threaten or deter" inmates from filing grievances and has no "animus toward any inmate for filing or mailing" grievances. *Id.* Melia specifically denies threatening Plaintiff, but avers that Plaintiff has threatened him. *Id.* Melia said that after the weapon was found, Plaintiff claimed he was "connected to important people at Central Office, and would make any statement necessary to get" Melia's job. *Id.*

Richter also provided an affidavit in which he asserts that he did not plant a weapon in Plaintiff's cell, did not conspire with anyone to "plant" a weapon in his cell, or write a false disciplinary report against Plaintiff. Doc. 36, Ex. C. Richter avers that he does not know "how the weapon came into existence or how it found its way" into Plaintiff's possession. *Id.*

**B. Plaintiff's evidence**

Plaintiff provided the opinion of Richard Orsini, a forensic document examiner, who opined that "some evidence" suggests the alleged anonymous inmate note which Richter said he found advising that Plaintiff had a shank in his cell could have been written by Richter. Doc. 42, Ex. C. Orsini advises that there is "not enough evidence to prove conclusively" that the inmate name was written by Richter. *Id.* In an affidavit submitted by inmate Carl Reed, he states that he observed Richter search Plaintiff's "room by himself." Doc. 42, Ex. B at 2. Reed also stated that during the time Melia worked as the housing supervisor in the L-dorm, "he repeatedly rode roughshod over the dorm." *Id.* at 3. "He threatened to and did set inmates up for little or no reason." *Id.*

In addition, Plaintiff provided the affidavit of inmate Mark Picket who observed Richter conduct the search of Plaintiff's cell. Doc. 42, Ex. A. Picket stated that he saw Richter reach "into his right leg pocket on his uniform and" extract an object. *Id.* at 2. He kept the item concealed until Melia came to the cell with Plaintiff and then he showed "Melia what he'd extracted from his leg pocket." *Id.*; *see also* Doc. 42, Ex. B at 2. Picket overheard Plaintiff say to Richter: "Don't let Melia make you do this, you know that's not mine." *Id.*

Plaintiff submitted his own affidavit in which he stated that prior to the events at issue in this case, he was given a job reassignment so he could be removed from working under Melia. Doc. 42, Ex. L at 4-5. When Melia learned of the reassignment, he searched Plaintiff's cell and put him in confinement on a "bogus disciplinary report."

*Id.* at 5. The disciplinary report was thrown out and Plaintiff was released from confinement and returned to L-dorm. *Id.* The next time Plaintiff saw Melia, Melia said to Plaintiff: "I'll get'cha! I promise!" *Id.*

Plaintiff also told of an incident in which Melia deprived Plaintiff of a month of gain time because Plaintiff had been requesting cleaning supplies. Doc. 42, Ex. L at 3-4. When Plaintiff did not file a grievance concerning that event, Melia told Plaintiff he was disappointed; "I thought you would've written me up by now and we could go a few rounds." *Id.* at 4. Plaintiff said, "No sir," and Melia replied: "That's probably best, because I always win. I can and will make your life here miserable." *Id.* Plaintiff said he perceived Melia's comments as "a direct threat." *Id.*

Plaintiff's affidavit reiterates that on August 10, 2009, he told Melia that his cell light was out, and had been out for 14 or 15 days. Doc. 42, Ex. L at 5. Melia said he would move Plaintiff and his cell partner, Donald Voorheese, to another dorm (an open bay dormitory). *Id.* Plaintiff spoke to Captain Surles about the "security issue" of the proposed move, and Surles told Plaintiff he would talk to Melia. *Id.* at 6. After Surles spoke with Melia on the telephone, Surles instructed Plaintiff to report to Melia. *Id.*

Plaintiff met Melia, who was accompanied by Richter, in the foyer of wing one of L-dorm. *Id.* Plaintiff states that Melia began "screaming at" Plaintiff about initiating grievances, "making it look like I'm not doing work orders and maintenance, his father [meaning Richter's father], is not doing their job!" *Id.* at 6-7. Melia said he would get Plaintiff's light fixed that day, and then threatened Plaintiff by saying, "I'm Sicilian and I'll show you before the day is out who runs this f— dorm!" *Id.* at 7.

The light was replaced about a half hour later and then Richter came to Plaintiffs cell just ten minutes later and told Plaintiff to "cuff up," that he had to take Plaintiff to confinement." *Id.* at 7. When Plaintiff asked why, Richter said: "Because you know how it is with Sgt. Melia. You went over his head by going to Captain Surles about your cell light." *Id.* Richter said he had "to do what Sgt. Melia says" or he would be written up. *Id.* at 7-8. Richter told Plaintiff that he was going to confinement unless he could talk to Melia. *Id.* at 8. Richter told Plaintiff to go talk to Melia and he would search his cell while he was gone. *Id.* Plaintiff went to talk to Melia, but had to wait a few minutes. While he was waiting, Melia walked by Plaintiff after answering a radio call and then told Plaintiff to "come on." *Id.* Plaintiff and Melia returned to Plaintiff's cell, and Melia went to the cell door ahead of Plaintiff and asked Richter: "What'cha got?" *Id.* Richter then showed a shank to Melia and said, "I found it in his mattress." *Id.* Plaintiff protested that it was not his and said to Melia: "You know how [and[ why that knife was there and how it got there and I can pass a polygraph, can you?" *Id.* Plaintiff said, "I have family working for the Department of Corrections and I would never possess any weapon because I would not humiliate my family in that fashion." *Id.* Plaintiff was kept in confinement for approximately 44 days before he was released back to L-dorm. Doc. 42 at 12, 13 (citing doc. 36 at 6).

Plaintiff avers that several months later, Richter apologized to him "for his involvement in setting (hooking) [Plaintiff] up with the weapons charge." *Id.* at 14. Plaintiff said that Richter also admitted he had written the allegedly anonymous inmate request. *Id.*

Plaintiff submitted the affidavit of another inmate, Jerry West, who stated that in October of 2006, Melia threatened him with confinement over a "knife" he said was found in West's bunk. Doc. 42, Ex. O at 3. When West protested, Melia said he would not send him to confinement if he wanted to help himself by telling Melia "where a knife, a good one was[,] or [where] a tattoo gun was." *Id.* at 3. West agreed, but said he would need time to "find one" or see what he could do. *Id.* at 4. West "asked around for a tattoo gun" and after finding one, bought it for $10.00. *Id.* West had a friend put the tattoo gun "under a sink in G-2 dorm." *Id.* West then reported to Melia where the tattoo gun was located, and Melia "then went and 'found' [it] on a 'routine' search" to "make himself look good and get some brownie points." *Id.* West stated that his "debt" to Melia was "paid and [he] was not bothered no more by him, but others were." *Id.*

Plaintiff also file an affidavit from inmate Daniel Hamm. Doc. 42, Ex. P. Hamm stated that he overheard a conversation between Melia and another inmate, Thomas Knopp, who was requesting to "live in a single man cell." *Id.* at 1-2. Melia told him to put a shank in his cell and he would "lock him up and move [Knopp] right in." *Id.* at 2. When Melia turned and saw Hamm and realized he heard his conversation, he threatened Hamm: "If you tell anyone about this, I'll bury you . . . ." *Id.* After Plaintiff was charged with possession of a weapon and spoke with an investigator from the Inspector General's Office, Ms. Murphy, Plaintiff told her what Hamm overheard. *Id.* Murphy came to interview Hamm about it, but Hamm said he "knew nothing of what she was talking about" because of Melia's threat to him and "fear of retaliation." *Id.* at 3, 5.

Inmate Knopp provided his own affidavit, clarifying that when he asked Melia about a cell change, "there were no single man cells open and Sgt. Melia's reply to [his] request was 'Put a shank (homemade prison knife) in a cell for me and I'll get you a single man cell." Doc. 42, Ex. Q at 2. Knopp said that Melia "would regularly walk up and down the wing of L-dorm, making threatening statements and specifically threaten" inmates that if someone wrote a grievance on him, he would find out who had done it. *Id.* at 3.

Additional affidavits were also presented by Plaintiff. Doc. 42, Exhibits R-T. Those have not been detailed here because they are cumulative.

**Reply and Sur-reply, docs. 47, 50**

Defendants requested leave to file a reply to Plaintiff's response, asserting that Plaintiff's affidavit conflicts with his prior deposition testimony. Doc. 43.[4] Specifically Defendants note that in Plaintiff's deposition, he denied that either Richter or Melia told Plaintiff directly that they set him up. Doc. 47, Ex. H at 6. Plaintiff's affidavit stated that Richter apologized for setting him up and he admitted having written the anonymous inmate slip. *See* doc. 42, Ex. L at 14.

Defendants asserts that "[a] subsequent affidavit cannot contradict prior deposition testimony." Doc. 43 at 4 (citing Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc., 736 F.2d 656, 657 (11th Cir. 1984)). A later case, however, pointed out that there are problems with such an approach as inconsistent assertions may be caused by a faulty memory and not "a predisposition to lie" by presenting a sham

[4] Leave was granted to file the reply and sur-reply. Docs. 44, 49.

affidavit. *See* Lane v. Celotex Corp., 782 F.2d 1526, 1532-33 (11th Cir. 1986) (citing to Kennett-Murray Corp. v. Bone, 622 F.2d 887, 894 (5th Cir.1980) (stating that "every discrepancy contained in an affidavit does not justify a district court's refusal to give credence to such evidence" and finding that in "light of the jury's role in resolving questions of credibility, a district court should not reject the content of an affidavit even if it is at odds with statements made in an earlier deposition."). The better approach is to permit conflicts or perceived inconsistencies in a witness's testimony to be pointed out to a jury who will be in a better position to determine issues of credibility than merely comparing portions of a deposition transcript with an affidavit. The challenge here was one answer to one question. Thereafter, Plaintiff identified much of the evidence he presented in his response to summary judgment in his deposition. The answer to one question is relevant and may impact a determination of credibility, but it does not support finding that Plaintiff's affidavit is a sham.[5]

**Analysis**

**1. First Amendment Claim**

"It is well established that a prisoner's constitutional rights are violated if adverse action is taken against him in retaliation for the exercise of his First Amendment rights." Pate v. Peel, 256 F.Supp.2d 1326, 1336 (N.D. Fla. 2003) (citing Farrow v. West, 320 F.3d 1235, 1248 (11th Cir. 2003)); Mitchell v. Farcass, 112 F.3d 1483, 1490 (11th Cir.1997); Wright v. Newsome, 795 F.2d 964 968 (11th Cir. 1986); Adams v. James,

---

[5] Plaintiff submitted a second affidavit, doc. 50, Ex. F, which has been reviewed. Because the statements provided there are cumulative, they have not been set forth in the relevant evidence portion of this Report and Recommendation.

784 F.2d 1077, 1080 (11th Cir. 1986). Prison officials may not infringe on an inmate's First Amendment right to petition the government for a redress of his grievances with a practice that is "not reasonably related to legitimate penological objectives" or take certain actions "with the intent of chilling that First Amendment right." Harris v. Ostrout, 65 F.3d 912, 916 (11th Cir. 1995) (citing Turner v. Safley, 482 U.S. 78, 85-89, 107 S.Ct. 2254, 2260-61, 96 L.Ed.2d 64 (1987), and Wildberger v. Bracknell, 869 F.2d 1467, 1468 (11th Cir. 1989)); *see also* Pate, 256 F.Supp.2d at 1336. Retaliation in the prison setting may be established by demonstrating that a prison official took adverse actions against an inmate because he filed a grievance. *See* Farrow, 320 F.3d at 1248; Pate, 256 F.Supp.2d at 1336.

Courts use a burden shifting analysis in ruling on a prisoner's First Amendment retaliation claim. Moton v. Cowart, 631 F.3d 1337, 1341-42 (11th Cir. 2011). Plaintiff must establish three elements: "(1) 'his speech or act was constitutionally protected'; (2) 'the defendant's retaliatory conduct adversely affected the protected speech'; and (3) 'there is a causal connection between the retaliatory actions and the adverse effect on speech.' " Moton, 631 F.3d at 1341 (quoting Bennett v. Hendrix, 423 F.3d 1247, 1250 (11th Cir. 2005)). To show causation, the prisoner "must show that the defendant was 'subjectively motivated to discipline' the plaintiff for exercising his First Amendment rights." Smith v. Mosley, 532 F.3d 1270, 1278 (11th Cir. 2008) (quoted in Moton, 631 F.3d at 1341). If Plaintiff shows that "his protected conduct was a motivating factor behind any harm, the burden of production shifts to the defendant." Moton, 631 F.3d at 1341-42 (quoting Smith, 532 F.3d at 1278). Since this is Defendants' motion for

summary judgment, however, and Plaintiff has the ultimate burden of proof, Defendants need only point to evidence as to the legitimate reason and Plaintiff must show that there is a genuine dispute of material fact concerning Defendant's defense. *See* Osterback, 300 F.Supp.2d at 1254.

Defendants contend Plaintiff's First Amendment retaliation claim is insufficient because Plaintiff did not file a "grievance, but only verbally complained" about the light in his cell being out. Doc. 36 at 19. That argument is rejected. Prisoners retain First Amendment rights of free speech and to petition for redress of grievances. Farrow, 320 F.3d at 1248 (stating that "[t]he First Amendment forbids prison officials from retaliating against prisoners for exercising the right of free speech.") (quoted in O'Bryant v. Finch, 637 F.3d 1207, 1212 (11th Cir. 2011)); Pell v. Procunier, 417 U.S. 817, 822, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974) (holding that prisoners retain those rights that are "not inconsistent with [their] status as [prisoners] or with the legitimate penological objectives of the corrections system.") (quoted in Hollins v. Samuals, 540 F. App'x 937, 938 (11th Cir. 2013) (finding that inmate suffered an "adverse action" when his prison employment wages were reduced and then terminated)). "It is well established that a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." Al-Amin v. Smith, 511 F.3d at 1317, 1333 (11th Cir. 2008) (quoted in Moton, 631 F.3d at 1343). Plaintiff had the right to complain, in a respectful manner, about the conditions of his confinement. Plaintiff has shown that his verbal complaints about his light being out, and the security concern with moving him to an open bay dormitory, were made in a

respectful and appropriate manner. Plaintiff has met the first required element of his retaliation claim.

To demonstrate the second element, the Eleventh Circuit employs an objective test: "a plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter 'a person of ordinary firmness' from the exercise of First Amendment rights." Bennett v. Hendrix, 423 F.3d 1247, 1250 (11th Cir. 2005) (joining with the First, Second, Third, Sixth, Eighth, Ninth, Tenth, and D.C. Circuits in adopting the "ordinary firmness" objective test and rejecting the "subjective test, under which" a plaintiff would have to show that he was "actually chilled in the exercise of" his First Amendment rights);[6] Pittman v. Tucker, 213 F. App'x 867, 870 (11th Cir. 2007) (explaining "that a plaintiff need not show that his own exercise of First Amendment rights have been chilled, but instead a plaintiff can establish an injury if he can show that the retaliatory acts are sufficiently adverse that a jury could find that the acts would chill a person of ordinary firmness from exercising his First Amendment rights.") (citing Bennett, *supra*).

Defendants argue that Plaintiff cannot succeed on this claim because Plaintiff "was not deterred from filing any grievance, but in fact did file a formal grievance." Doc. 36 at 19. That argument is rejected. Although Defendants cite to Cole v. Sec'y Dep't of Corr., 451 F. App'x 827 (11th Cir. 2011), in support of the proposition that an inmate of

---

[6] "Bennett v. Hendrix, 423 F.3d 1247 (11th Cir. 2005), was not a prisoner retaliation case; rather, it involved retaliation claims brought by citizens against a sheriff for interfering with their support of a referendum, a First Amendment activity." Mosley, 532 F.3d at 1276, n.16. Nevertheless Bennett drew from cases such as "Thaddeus-X v. Blatter, 175 F.3d 378, 396 (6th Cir. 1999), which involved a claim that prison administrators had retaliated against an inmate for engaging in First Amendment activity." Smith, 532 F.3d at 1276.

ordinary firmness would not be deterred by the filing of a false DR, that case was concerned with whether or not plaintiff had exhausted administrative remedies as required by § 1997e(a). The plaintiff conceded he had not pursued administrative remedies, and did not "allege that a serious threat of substantial retaliation was made or, moreover, that any threat was made in the present context." Cole, 451 F. App'x at 828. The case should not be read for the broader proposition that filing an allegedly false disciplinary report against an inmate can never constitute adverse action. Similarly, the citation to Pittman v. Tucker, is not helpful because there, the Court noted "that a jury could find that the prolonged campaign of harassment . . . could have such a chilling effect." 213 F. App'x at 870.

Here, Plaintiff came forward with evidence to show that he was subjected to disciplinary confinement and a possible separate criminal charge[7] because of his protected speech. *See* Mosley, 532 F.3d at 1277 (stating that the second element of a retaliation claim is that prisoner must "show that the discipline he received 'would likely deter a [prisoner] of ordinary firmness' from complaining about the conditions of his confinement' and concluding that receiving a disciplinary report for his complaints meets the objective standard). It is not necessary to show that Plaintiff was deterred from filing a grievance; it is enough to show that the discipline "would likely deter" an ordinary prisoner from further complaints. Plaintiff has shown that the shank was found in a questionable search and the disciplinary report was written within two hours after Plaintiff had complained about the light. Plaintiff has evidence that Richter had the knife

[7] Plaintiff submitted evidence to show that some prisoners have been criminally charged with possession of a weapon. Doc. 42, Exhibits M, N.

on his person and did not find it in Plaintiff's mattress, and Plaintiff has testified in his affidavit that Richter later admitted having set up Plaintiff. A reasonable jury could find that planting evidence to falsely set up a prisoner for discipline would deter an ordinary person from exercising his First Amendment rights and is sufficient to constitute adverse action.

There is a genuine dispute of fact as to the third element, whether there is a causal connection between the retaliatory actions and the adverse effect on speech. Plaintiff has provided evidence showing that Melia sought to retaliate against Plaintiff because he was angry that Plaintiff had complained and gone over his head to discuss the matter with Surles. Plaintiff has provided evidence that Richter was a participant in that retaliation by planting the shank in his mattress and issuing the disciplinary report. Although Defendants dispute the evidence and contend that the same action would have been taken in the absence of Plaintiff's protected activity, there is sufficient evidence to survive summary judgment. *See* Smith v. Fla. Dep't of Corrs., 713 F.3d 1059, 1063-64 (11th Cir. 2013) (viewing the evidence in the light most favorable to the plaintiff, the Court concluded that denial of summary judgment motion was proper when prison provided evidence that his "protected conduct was a motivating factor behind" transfers to other prisons). Here, Plaintiff has raised a genuine dispute of material fact, provided evidence in support of all three elements, and the motion for summary judgment should be denied.

As an additional point, Defendants argue that Plaintiff cannot proceed because he received due process in the disciplinary proceedings. Doc. 36 at 19-20. Plaintiff did

not allege a separate due process[8] claim in his complaint. *See* doc. 1. Plaintiff confirmed in his deposition that there were no other claims besides his First Amendment retaliation claim and his Eighth Amendment claim for inflicting punishment on him "that was undeserved and unwarranted." Doc. 36, Ex. e at 27. Plaintiff's First Amendment claim may proceed in this case because the disciplinary report was overturned. Notwithstanding Plaintiff's due process arguments when seeking to have his disciplinary report overturn, Plaintiff did not raise a due process claim in this case. Plaintiff argued in his response to the summary judgment motion that he has "a substantial degree of due process entitlement (substantive due process entitlement) to be free from retaliation in the form of false misconduct charges." Doc. 42 at 33. That should not, however, be construed as a separate due process claim. Plaintiff's complaint does not present a due process claim Defendants' argument on this point should be rejected.

Similarly, Defendants argue that Plaintiff's conspiracy claim must fail under the intracorporate conspiracy doctrine. Doc. 36 at 10-11. Plaintiff argue that such a claim is actionable because the Department of Corrections is not a Defendant in this case and because the Defendants were not acting within the scope of their employment during

[8] It is well established that a due process claim is based upon the Fifth and Fourteenth Amendment, not the First or Eighth Amendments. Hall v. Plumber Official, 446 F.App'x 184, 187 (11th Cir. 2011); Magluta v. Samples, 256 F.3d 1282, 1283 (11th Cir. 2001).

the events in questions. Doc. 42 at 27-28. Plaintiff did not raise a separate conspiracy claim[9] in the complaint. *See* doc. 1.

Defendants argue that Plaintiff "cannot establish any malicious prosecution or Eighth Amendment claims." Doc. 36 at 21. Defendants point out that Plaintiff is a lawfully convicted prisoner, his health or safety was "not at issue in this action," and he "cannot demonstrate any violation of any constitutional right." *Id.* Plaintiff did not raise a malicious prosecution claim, which he acknowledges in his response. *See* doc. 42 at 33. Defendants also state that "any state law claims are subject to dismissal." *Id.* at 21. Plaintiff did not raise any state law claims. Defendants' arguments are rejected.

**2. Eighth Amendment claim**

Plaintiff did, however, raise an Eighth Amendment claim. The Eighth Amendment[10] governs the conditions under which convicted prisoners are confined and

---

[9] Had Plaintiff raised such a claim, it would be dismissed under that doctrine which has been extended beyond the world of corporations, and applies to public entities such as a city and its employees, Denney v. City of Albany, 247 F.3d 1172, 1190-91 (11th Cir. 2001) (holding that where the "only two conspirators identified" were both City employees, the intracorporate conspiracy doctrine barred plaintiffs' § 1985 conspiracy claims) (citing Dickerson v. Alachua Cnty. Comm'n, 200 F.3d 761, 768 (11th Cir. 2000)), and government entities. Rehberg v. Paulk, 611 F.3d 828, 854 (11th Cir. 2010) (stating that "intracorporate conspiracy doctrine bars conspiracy claims against corporate or government actors accused of conspiring together within an organization"). It has also been applied to claims alleging that "employees of the FDOC" conspired to violated an inmate's constitutional rights "in retaliation for his filing grievances . . . ." Claudio v. Crews, No. 5:13cv345-MP/EMT, 2014 WL 1758106, at *6 (N.D. Fla. May 1, 2014) (dismissing conspiracy claim brought in § 1983 action); *see also* Briggs v. Hancock, No. 3:13-CV-212-J-39MCR, 2014 WL 5378527, at *9 (M.D. Fla. Oct. 21, 2014) (same).

[10] "In the prison context, three distinct Eighth Amendment claims are available to plaintiff inmates alleging cruel and unusual punishment, each of which requires a different showing to establish a constitutional violation." Thomas v. Bryant, 614 F.3d 1288, 1303-04 (11th Cir. 2010). This case raises only a claim to the conditions of

the treatment they receive while in prison. Farmer v. Brennan, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Although the Amendment does not require comfortable prisons, it prohibits inhumane ones. *Id.* The Eighth Amendment guarantees that prisoners will not be "deprive[d] ... of the minimal civilized measure of life's necessities." Rhodes v. Chapman, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981) (quoted in Chandler v. Crosby, 379 F.3d 1278, 1289 (11th Cir. 2004)). "[B]asic human necessities include food, clothing, shelter, sanitation, medical care, and personal safety." Harris v. Thigpen, 941 F.2d 1495, 1511 (11th Cir. 1991) (cited in Collins v. Homestead Corr. Inst., 452 F.App'x 848, 850-851 (11th Cir. 2011)). "[T]o make out a claim for an unconstitutional condition of confinement, 'extreme deprivations' are required . . . ." Thomas v. Bryant 614 F.3d 1288, 1304, 1306-07 (11th Cir. 2010) (concluding that non-spontaneous use of chemical agents on inmates with mental illness violated the Eighth Amendment) (citing Hudson v. McMillian, 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)); Spires v. Paul 581 F.App'x 786, 792 (11th Cir. 2014).

Defendants provide little to no argument or analysis of Plaintiff's Eighth Amendment claim. Doc. 36 at 18-19, 21. Plaintiff also does not provide meaningful argument in support of this claim. However, Defendant did *briefly* argue in one sentence that Plaintiff cannot establish an Eighth Amendment claim. Plaintiff did not come forward with proof to demonstrate that he suffered an "extreme deprivation" under the Eighth Amendment. The fact that a light in his cell was out for approximately two

---

confinement. It is not an excessive force claim or deliberate indifference to medical needs claim.

weeks before being replaced is clearly insufficient. The only other issue raised was that Plaintiff was placed in disciplinary confinement for approximately 44 days before he was released back to his dormitory when the disciplinary report was overturned. *See* doc. 36, Ex. E at 18. The only real impact on Plaintiff from that punishment was the loss of visitation privileges during that time. *Id.* at 19-22.

It is axiomatic that "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948). The lack of visitation opportunities with friends and family is part of the penalty of incarceration, and the denial of 44 days of visitation is not an extreme deprivation. Because no other basis for an Eighth Amendment claim is apparent, the summary judgment motion should be granted in Defendants favor on the Eighth Amendment claim.

**3. Qualified Immunity**

Defendants assert qualified immunity as a defense. Doc. 36 at 21-22. It was well established prior to the events in question that prison officials may not retaliate against an inmate for exercising his First Amendment rights. Farrow v. West, 320 F.3d 1235 (11th Cir. 2003); Mitchell v. Farcass, 112 F.3d 1483, 1490 (11th Cir. 1997); Wright v. Newsome, 795 F.2d 964 968 (11th Cir. 1986); Adams v. James, 784 F.2d 1077, 1080 (11th Cir. 1986). Defendants are not entitled to qualified immunity.

**4. Damages**

Defendants argue that Plaintiff is not entitled to any damages. Doc. 36 at 22-23. Defendants are correct that Plaintiff was previously advised that without physical injury, any request for damages must be limited to nominal damages. *Id.* (citing to doc. 3). Plaintiff did not suffer any physical injury as a result of the alleged First Amendment violations. Thus, even if successful after trial of these claims, Plaintiff's request for $250,00.00 in monetary damages must necessarily be limited to nominal damages as required by 42 U.S.C. § 1997e(e). Harris v. Garner, 216 F.3d 970 (11th Cir. 2000)[11], *reinstating in part* 190 F.3d 1279 (11th Cir. 1999); Osterback v. Ingram, et al., No. 00-10558, 263 F.3d 169 (11th Cir. 2001) (Table). Furthermore, the PLRA also precludes an award "of punitive damages in the absence of physical injury." Al-Amin v. Smith, 637 F.3d 1192, 1199 (11th Cir. 2011). That is not to say that punitive damages are never available to a prisoner. *See* doc. 42 at 41-43. The Eleventh Circuit has, however, expressly held that such damages cannot be awarded for mental or emotional injury without physical injury. Plaintiff's citation to Harden v. Pataki, 320 F.3d 1289 (11th Cir. 2003), is not helpful because the court was not called upon to determine whether § 1997e(e) barred a request for damages. *See* doc. 42 at 40. Harden only stands for the proposition that a claim challenging the validity of procedures used to extradite a prisoner from one state to another is not barred by Heck v. Humphrey, 512 U.S. 477, 487, 114 S.Ct. 2364, 2372–73, 129 L.Ed.2d 383 (1994). The motion for summary

[11] Harris v. Garner, 190 F.3d 1279 (11th Cir. 1999) was vacated by 197 F.3d 1059, and the Opinion Reinstated in Part on Rehearing by 216 F.3d 970 (11th Cir. 2000), *cert. denied* 121 S. Ct. 2214 (2001). The parts of the panel opinion relevant to this legal issue were reinstated.

judgment should be granted on this issue and Plaintiff is only entitled to nominal damages should he prevail at trial.

**RECOMMENDATION**

In light of the foregoing, it is respectfully **RECOMMENDED** that Defendants' motion for summary judgment, doc. 36, be **GRANTED** as to Plaintiff's Eighth Amendment claim, and that Plaintiff's request for damages be limited to nominal damages only, but that the motion for summary judgment otherwise be **DENIED**. It is further recommended that this case be **REMANDED** to determine if a second, brief discovery period should be provided prior to setting this case for trial as noted in the Initial Scheduling Order, doc. 28 at 3.

**IN CHAMBERS** at Tallahassee, Florida, on February 9, 2015.

S/ Charles A. Stampelos
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**

**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 14 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**